**TEXAS & N. O. R. CO. v. LIDE et al.**

No. 12923.

Court of Civil Appeals of Texas. Dallas.

Oct. 19, 1940.

Rehearing Denied Nov. 16, 1940.

Baker, Botts, Andrews & Wharton, of Houston, and Landman & Landman, of Athens, for appellant.

Ross Huffmaster, of Kaufman, for appellees.

BOND, Chief Justice.

Appellees, in County Court of Kaufman County, recovered judgment against appellant, in the sum of $545.10, as damages alleged to have been sustained by a shipment of 40 head of cattle from Lufkin to Mabank, Texas. Plaintiffs (appellees here) alleged negligence·of the defendant in improper bedding, delay, and rough handling of the cattle in transit, and subsequent damage—8 cattle killed and 32 injured; also that the cattle were delivered to the railroad at Lufkin in good condition and received at Mabank in a damaged condition; thus, relying for recovery upon presumptive negligence on the part of the Railroad Company's operatives in the transportation of the cattle.

The defendant answered by general denial, and specially alleged that its agents

and servants handling the shipment, operated its train in the ordinary and usual manner; that no unusual or unnecessary jerking or bumping of its trains occurred; that it was not guilty of any act of negligence in the movement of its train and the handling of the cattle; that injury to the cattle was due solely to their natural vice, weakness, and inherent propensities; and that plaintiffs were guilty of negligence, proximately causing all the injuries, in the following particulars: (1) Plaintiffs loaded into the car in question certain weak cattle; (2) loaded cattle which were high-tempered and of a vicious nature; and (3), loaded the cattle too soon after they had been dipped in a strong solution, causing them to become restless and of a kicking and goring disposition.

The cause was submitted to a jury, resulting in findings: (1) That plaintiffs did not load any cattle at Lufkin which were unusually weak and unable to stand the journey from Lufkin to Mabank; (2) that the solution in which the cattle were dipped immediately before delivery did not irritate and cause them to be unusually vicious; (3) that plaintiffs did not load wild and vicious steers into the car with weaker cattle; (4) that the death of the 8 cattle in question was not caused by the loading of any unusually weak, wild, or vicious cattle in the car; and (5) that none of the animals were injured because of their viciousness after they were loaded for shipment at Lufkin; the jury also found (6) that the reasonable market value of the 8 dead cattle at the time of their arrival at Mabank—had they arrived in the condition they would have been in but for their injuries and death—was $360; (7) that the reasonable value of the 32 head of live cattle, at the time of their arrival at Mabank—had they been delivered there at said time without injury—was $1,440; and that the reasonable market value of said 32 head of cattle at Mabank, at the time they were delivered and in their then condition, was $1,340; and (8) (on request of defendant) that plaintiffs did not load into the car in question certain weak cattle, which a person of ordinary prudence would not have loaded under the existing circumstances. On such findings of the jury, the court entered judgment in favor of plaintiffs for the sum of $460, plus $85.10, interest from date of the alleged damage to date of shipment, with 6% interest on such judgment until paid. The defendant duly excepted, gave notice of and perfected this appeal.

We think the testimony amply sustains the findings of the jury. The 40 head of cattle were in good physical condition when delivered to defendant, normal tractable cattle, free of inherent defects or vices, and that the dipping of the cattle immediately before shipping was not calculated to irritate them, or cause them to be vicious and hard to handle. The cause of the death of the 8 head of cattle and injury to 32 head is not disclosed by any direct testimony. The shipment was not accompanied by shippers, and the testimony of the train operatives does not disclose knowledge of the manner of injury and death of the cattle. Very evidently, something caused the loss by death and injury to the cattle while in the possession of the Railroad Company. Plaintiffs' theory is that, the cattle sustained damage through unnecessary rough handling, and lack of due care, based upon legal presumption of negligence of the carrier, proximately causing such loss and injury.

As a general rule, where it is shown that live stock were delivered to the carrier in good condition, and that the shipper or his agent did not accompany them under a contract to care for them during transit, and they arrived at destination dead or in an injured condition, negligence is ordinarily presumed to the extent that the shipper is said to have made out a prima facie case, casting upon the carrier the burden of showing that the loss or injury was not the result of its negligence, or that such was due to the natural vice, weakness, and inherent propensities of the cattle, or to some cause which would exempt it from liability. 13 C.J.S., Carriers, § 254, p. 551; Panhandle & S. F. Ry. Co. v. Wilson, Tex.Civ.App., 135 S.W.2d 1062. Recognizing this burden, defendant sought to free itself from such imputation of negligence and absolve liability for the cattle's disorder, by showing that the shippers negligently loaded weak cattle into the car; that the cattle were vicious and wild; and that, the dipping of the cattle in arsenical solution immediately before delivery at Lufkin caused them to become restless, proximately causing the damage.

We would be inclined to accept defendant's proof as being sufficient to exonerate it from liability in the particulars above mentioned; and, if the proof in the

case had stopped there, or had been sustained by findings of the jury, undoubtedly the trial court would have been warranted in entering judgment for the defendant; but, such is not the case; plaintiffs' evidence rebutted defendant's issues relative to the inherent vice, weakness, and natural propensities of the cattle and the effect of dipping immediately before delivery. Such being controversial issues of fact, and defensive issues, the findings of the jury must be sustained, as was done by the trial court. Therefore, we think the carrier has failed to fully exonerate itself from the imputation of negligence by its attempt to show that the death of 8 head of cattle and injury to 32 head were caused by the shippers' contributory negligence in loading weak, vicious, and wild cattle, too recently dipped for shipment.

Under such jury findings, obviously, we must conclude that the shippers delivered to the carrier 40 head of tractable cattle in good condition, and the undisputed fact is, that 8 of them were killed and 32 injured in transit. Such being true, plaintiffs have made out a prima facie case of negligence against the Railroad Company. When such loss or injury to the cattle was shown not to have been caused by inherent defects or qualities of the shipment, the carrier then had the burden of exculpating itself from all negligence reasonably calculated to cause damage to the shipment entrusted to its care as a common carrier. There remained only the issue of negligence of the carrier, its agents and employes, in the handling of the shipment.

The defendant adduced witnesses who handled the cattle from the time received at Lufkin until delivered to shippers at Mabank. By this testimony, defendant tried to exonerate itself from all negligence, and we conclude that it successfully did so, except as same was rebutted by the physical condition of the cattle, and the lack of suitable and proper facilities for unloading and reloading them at Jacksonville, an intermediate point enroute, after the railroad employes discovered that they were in a condition of unrest and that several were down in the car.

The testimony in the case shows the cattle were first loaded in trucks, at a point about twenty miles from Lufkin, at 6 or 7 o'clock A. M. on April 15, 1936, carried to Lufkin, where they were dipped in an arsenical-caustic-soda solution some two hours before delivery, loaded into defendant's railroad car for transportation at 10:45 A. M.; and that the shipment arrived at Nacogdoches at 11:45 A. M. The operatives of the train testified there was no rough handling, unnecessary switching or jerking of the train, and that nothing unusual happened to the train or cattle from Lufkin to Nacogdoches; there were no cattle down in the car, and nothing about their condition attracted attention. At Nacogdoches, the car was cut out of the train and attached to a train going to Jacksonville. Mr. Henderson, defendant's conductor, testified that "the cattle were in good condition" at Nacogdoches. The shipment left Nacogdoches at 12:45 P. M., arriving at Jacksonville, 3:15 P. M. On this run, the train's first stop was at Cushing, about 20 miles from Nacogdoches, where it took on freight, but there was no switching; then, at Cycle, another stop was made; the train switched in some cars and continued on to Jacksonville. Mr. Fuller, train conductor, said that when the train reached Jacksonville, "three of the cattle were down and two apparently dead. We left them in there and turned the car over to the switching crew. We are supposed to get the cattle up when we find them down, or make a reasonable effort to do so. We are supposed to do whatever is necessary to get the cattle up in as good condition as possible. There was no unusual handling of this train from Nacogdoches to Jacksonville, and no switching of the cattle". The cattle remained in the car at Jacksonville from 3:15 P. M. until 3:55 A. M. (April 16th). At 9 o'clock P. M., the switching crew took the car to the stockpen for the purpose of unloading, and removing the dead and injured. To do this, the Company's agent sent a negro porter and a clerk, two of its employes, to the stockpen, at about 9 o'clock that night, and, according to their testimony, because of the viciousness of the cattle, their fighting, and wild disposition, they were unable to unload them without additional help which, at the time, was not available. At 3:55, the car was switched to defendant's main line, set into the train, and proceeded to Mabank. Enroute to Mabank, the train stopped at all intermediate points and took on freight and baggage; no unusual switching or handling of the car is related; it moved in the usual and ordinary manner. The car was "set out" at Mabank at 6:05 A. M., April 16, and the cattle were then delivered to shippers—5 dead,

3 fatally injured, later dying, and 32 skinned and bruised, hair and skin rubbed off. There was no evidence of hooking or goring—the skin and flesh not being torn. Mr. Hide testified: "There wasn't a steer in there but what was skinned up terribly, some worse than others. Just all over; no particular part—backs, necks, hips, and legs. There were marks on them that didn't have any hair on them, scars on them remained for a year." He further testified that he was an experienced cattleman, had shipped many loads of cattle, and had helped unload the cattle in question from the car at Mabank. He said: "When we got to Mabank, we intended to hand them over to Mr. Norman on a truck, and we backed my car up to the car, —first opened the door and took the 'bullboard' down and I got in and roped one and drug him through the door into the truck and pulled another one in and tried to scare the rest of them out and decided then to move the truck and put some grain doors up to the train, and we did that. I went inside and got them to come out. When I was inside with them, none of the steers attempted to fight or hook me." Mr. Heidle testified to practically the same facts, and further said that he was present when the cattle were loaded at Lufkin, and unloaded at Mabank; that he was familiar with their condition, saying: "We would call them in good living order. Stout cattle for the time of the year. They had been fed hay and went into the winter in good shape and they were just what I would call stout cattle for March or April. Good living order. They were not wild or vicious, and when they were unloaded, they were not restless, wanting to fight Mr. Lide. He went among them in the car to help unload them in his truck; they were skinned and bruised, and several dead."

■ We think the evidence shows that the defendant, in not unloading the cattle at Jacksonville after seeing their disorder, failed to exercise due care. They stood in the car at the stockpen for twelve hours, and the fact that the carrier did not have sufficient help to unload them under such circumstances is no excuse. The railroad employes, having seen the perilous condition of the cattle, were, we think, impelled, in the exercise of due care, to furnish suitable and adequate facilities for unloading and reloading the cattle for water and rest, especially so, when the railroad agents saw the necessity for the discharge of such duty. Southern Pac. Co. v. W. T. Meadors & Co., Tex.Civ.App., 176 S.W. 882.

■ Furthermore, we think the condition of the cattle, on arrival at destination and delivery to shippers, sufficiently rebuts defendant's testimony that they were properly handled and that the switching of the train was usual and customary; or, at least, raises such a reasonable inference of rough handling as to create a controversial issue; and, the burden being on the carrier to show that death and injury to the shipment was not the result of negligence, it devolved upon defendant to request such issue, to free itself from such imputation. Having failed to do this, the issue must be considered waived, or found by the court to have existed. In the light of this record, defendant has failed to meet the burden; thus, presumptive negligence in the handling of the cattle in transit must prevail. The verdict of the jury having acquitted the plaintiffs in all the alleged causes claimed by defendant which would exempt it from liability, other than due care in the handling of the shipment, the trial court did not err in rendering judgment for the shippers.

■ On motion for judgment, the trial court allowed plaintiffs 6% interest on the amount recovered, from date of injury to the cattle to date of judgment. There were no pleadings for such interest as an element of damage and, in the absence of a special plea, the court was not warranted in assessing $85.10 interest. In such case, interest is allowed, as a matter of law, only from date of judgment. Interest, eo nomine, is not recoverable until after judgment. Texas Electric Ry. Co. v. Greenhill, 112 Tex. 419, 247 S.W. 840; Southern Gas & Gasoline Engine Co. v. Adams & Peters, Tex.Com.App., 227 S.W. 945. Therefore, the judgment of the court below is reformed, deducting $85.10 therefrom, and, as reformed, is affirmed for $460, with interest from date of judgment until paid, and all costs of the court below. Other assignments of error urged by appellant have been considered, are, we think, without merit, and are accordingly overruled.

Judgment of the court below is reformed and, as reformed, affirmed.

Reformed and affirmed.